OPINION OF THE COURT
Kristin Booth Glen, S.
This motion to withdraw as counsel raises serious and important issues about the obligations of the court and of counsel when it appears that a client who is a defendant in a civil action lacks capacity to assist or participate in the defense of that action.
Movant represents Diane Wells, defendant in an action initially brought in Supreme Court, New York County, by her now-deceased mother, Joyce Cheney. Following Joyce’s death, her son, and Diane’s brother, James Cheney, preliminary executor of Joyce’s estate, was substituted as plaintiff. While there are 11 separate causes of action,[1] the common factual background involves claims that, while living with Joyce in Joyce’s apartment, Diane engaged in a long course of harassment, threats and mistreatment of her mother that ended only when Diane was arrested and convicted for an assault on Joyce resulting in the latter’s broken arm. Subsequent criminal charges against Diane, for allegedly soliciting her brother’s murder, were dismissed.
*163 After various proceedings in Supreme Court, during which Diane was first represented by Raoul Felder,[2] and then by Kramer & Dunleavy,[3] the case was transferred to this court by order dated August 23, 2007.[4]
Since that time, as the case moved toward trial, Diane has gone through four separate sets of counsel. She was initially represented by the Law Offices of Gerald Shargel and Wachtel & Masyr, LLP by Howard Elman; on January 15, 2008 and February 25, 2008, Judd Burstein was substituted for Elman and Shargel, respectively. Burstein moved to be relieved in March 2008, stating, inter alia, that Diane has made it “unreasonably difficult” for him “to carry out employment effectively,” citing Code of Professional Responsibility DR 2-110 (c) (1) (iv) (22 NYCRR 1200.15 [c] [1] [iv]), and that “it is almost impossible to adequately describe the nightmare of representing Ms. Wells.” Burstein noted, “It is clear that Ms. Wells is a severely emotionally damaged person.” Describing a conference call about discovery matters, and an upcoming court date, Burstein reports that Diane “explained to [a court attorney/referee] that she was psychologically incapable of appearing in court” on the appointed date. After a conference with the court, at which he further elucidated the difficulties which led to his motion, Burstein was permitted to withdraw, and Diane was given a continuance to obtain new counsel. As of that date, the trial was scheduled to begin on May 18, 2008.
In April 2008, Diane retained Joshua R. Katz,[5] an attorney who had previously been employed at the Felder firm. The retainer agreement anticipated that Katz would secure the services of trial counsel, and in May 2008, after interviewing several firms, he was successful in matching Ms. Wells with the law firm of Castro & Karten. Almost literally on the eve of trial, that firm sought an adjournment which was vigorously opposed *164 by James’ counsel. Castro & Karten assured the court that, unlike previous counsel, they would be able to effectively deal with Diane and be ready for trial in August 2008. Citing Diane’s psychiatric problems and communications with her treating psychiatrist, Dr. Stuart Serdam, new counsel noted his prescription of new medications, and Diane’s promise that she would have live-in help to ensure that she took those medications which would allow her to relate effectively and appropriately to counsel in the course of trial preparation and trial.[6]
The motion was granted, and the trial was adjourned to August 4, 2008, marked final against defendant. On July 18, Castro & Karten moved for leave to withdraw on the grounds, inter alia, that “Wells has engaged in such conduct which renders it unreasonably difficult for Castro & Karten to carry out its employment effectively” pursuant to DR 2-110 of the Code of Professional Responsibility. In support of their motion, they supplied an extensive in camera affidavit detailing issues and difficulties in their representation of Diane.[7]
Shortly thereafter, Joshua Katz also moved to withdraw on several grounds, including “a breakdown in communication such that [Diane] refuse[d] to accept [his] advice- and counsel” and Diane’s “verbally abusive behavior.” In addition, because of Castro & Karten’s motion, Katz now feared that he would be required to serve as trial counsel, a role for which, he claimed, he was neither suited nor retained.[8] On July 28, the return date of both motions, after considerable colloquy, Castro & Karten’s motion was granted and Katz’s held in abeyance, as the latter neither alleged nor provided information (in camera or otherwise) that the attorney-client relationship had so deteriorated that he could no longer represent Diane consistent with his *165 ethical responsibilities.[9] Once again the trial date was adjourned, this time to October 22nd, and again it was marked final against Diane.
Thereafter, in August 2008, Diane filed a consent to change attorney and notice of appearance from Stephanie E. Kupferman of Kupferman & Kupferman. Counsel for James then moved to require Katz to remain as counsel because “[g]iven the unique and troubling history here — where the defendant has cycled through 13 sets of attorneys — Katz, the only relative constant, should be required to stay in the case, to avoid any future problems and to ensure availability of trial counsel on October 22.”
On September 5, with Ms. Kupferman present, confidently stating her willingness and ability to represent Diane at trial, that motion was denied,[10] leaving Kupferman & Kupferman as the sole counsel.
Even as all these changes of counsel were occurring, there was a pretrial conference, and numerous in limine motions were made and decided.[11] Various issues regarding Diane’s witness list (containing 29 witness names, which were described as required by the court’s pretrial order, and 45 names, lacking the required description as to the substance and relevance of their expected testimony) and possible medical expert(s) were still pending; Kupferman was directed to parse and amplify the witness list, settle on a medical expert and supply the appropriate summary of expected testimony, and certify that all discovery demands had been complied with.[12]
Kupferman now moves for leave to withdraw “on the ground that a substantial conflict exists between the Kupferman firm *166 and Ms. Wells precluding their continued representation of her in this matter.” She submits two in camera affidavits[13] setting forth with more particularity the grounds upon which she believes that, as she stated in open court, continued representation would cause her to violate her ethical obligations under New York’s Code of Professional Responsibility (the Code). Although served with the motion, Diane did not appear on the return date; the motion was marked “submitted” and all counsel[14] were directed to appear for a previously scheduled conference on October 7.[15] Kupferman was also directed to again notify Diane of that conference, and to convey the court’s direction that she attend.
The court met with Diane, Kupferman and Novick for more than an hour and conversed extensively with Diane about the extremely difficult situation in which she had once again placed herself. She was scheduled, in two weeks, for a trial marked final against her; she had no counsel willing to represent her; the trial would involve complicated evidentiary issues far beyond the command of any nonlawyer; and, if she lost the trial, she could potentially lose both her home and more than $3.8 million. During that conversation, as had previously been detailed in various attorneys’ in camera affidavits, and as the court observed at prior in-court appearances,[16] it was apparent not only that Diane was incapable of managing the instant litigation, but also that she was unable to appreciate the consequences of that incapacity.[17]
This is, of course, precisely the situation addressed by Mental Hygiene Law article 81, our adult guardianship statute. Article 81 begins with the presumption that every adult is fully capaci *167 tated, and then permits appointment of a guardian only for those areas in which a person “is likely to suffer harm because” she “is unable to provide for personal needs and/or property management; and . . . the person cannot adequately understand and appreciate the nature and consequences of such inability” (Mental Hygiene Law § 81.02 [b] [1], [2]). Article 81 guardian-ships are intended to be “closely tailored” to an individual’s incapacity, and to replace her autonomy only to the extent necessary to protect her from harm with regard to such incapacity.[18] Thus, a person who is adequately managing personal needs and most financial needs might, as may be the case here, need a guardian only for a specific and limited purpose[19] (see Mental Hygiene Law § 81.16 [b]).
This case calls out for a judicial determination, based on an evidentiary hearing, as to whether Diane is capable of managing this litigation within the definition of article 81. If she is, then the case will be tried, with or without counsel representing her. If she is not, and the article 81 court so determines, a limited property guardian can be appointed and the trial will proceed with that guardian directing the litigation, including any counsel she may choose to retain. All parties and counsel— including even Diane — agree that an article 81 proceeding is appropriate and should be commenced.[20]
*168 The difficulty arises in ascertaining precisely who can or should bring the proceeding. The statute requires the article 81 petition to contain
“specific factual allegations as to the financial transactions or other actual occurrences involving the person alleged to be incapacitated which are claimed to demonstrate that the person is likely to suffer harm because he or she cannot adequately understand and appreciate the nature and consequences of his or her inability to provide for property management” (Mental Hygiene Law § 81.08 [a] [5]).
In this case, that would include only those who are or have been privy to the often confidential[21] communications between attorney and client.
The Code is decidedly unhelpful in determining whether counsel may[22] or should commence a guardianship proceeding for an allegedly incapacitated client (see Assn of Bar of City of NY Comm on Prof Responsibility, A Delicate Balance: Ethical Rules for Those Who Represent Incompetent Clients, 52 Rec of Assn of City of NY, at 34 [1997] [Bar Report]). While there are *169 several nonbinding Ethical Considerations[23] that bear upon the obligations of an attorney representing an incapacitated client,[24] they make no reference to guardianship or other protective proceedings except insofar as they require an attorney to take direction from an already existing guardian or other “duly constituted” personal representative.
Further, even the few, somewhat contradictory ethical opinions that exist do not provide clear guidelines (Bar Report at 38-39).[25] Commentators have concluded that the Ethical Considerations “no longer reflect[ ] the state of the law or realities of disability law practice”[26] (but see NY St Bar Assn Comm on Prof Ethics Op 746 [July 18, 2001] [permitting an attorney who holds a durable power of attorney to commence an article 81 proceeding without his client’s consent when the client is incapacitated, where there is no practical alternative to protect the client’s interests through the durable power or otherwise, and where no one else is available to serve as petitioner]).
In the absence of guidance from the Code, it is appropriate to look to the two main sources of legal ethics in this country, the ABA Model Rules of Professional Conduct and the Restatement *170 (Third) of Law Governing Lawyers (2000) (Restatement).[27] Model rule 1.14, “Client With Diminished Capacity,” provides:
“(a) When a client’s capacity to make adequately considered decisions in connection with a representation is diminished, whether because of minority, mental impairment or for some other reason, the lawyer shall, as far as reasonably possible, maintain a normal client-lawyer relationship with the client.
“(b) When the lawyer reasonably believes that the client has diminished capacity, is at risk of substantial physical, financial or other harm unless action is taken and cannot adequately act in the client’s own interest, the lawyer may take reasonably necessary protective action, including consulting with individuals or entities that have the ability to take action to protect the client and, in appropriate cases, seeking the appointment of a guardian ad litem, conservator or guardian.”[28]
Restatement § 24 provides:
“(4) A lawyer representing a client with diminished capacity as described in Subsection (1)[29] may seek the appointment of a guardian or take other protective action within the scope of the representation when doing so is practical and will advance the client’s objectives or interests, deter *171 mined as stated in Subsection (2).”[30]
Here, where it can be reasonably determined that Diane is unable to act in her own interest, and, as the Restatement adds, no other practical method is available to protect her interest,[31] these authorities would permit Kupferman to commence an article 81 proceeding to appoint a limited property guardian to litigate and defend the instant action.
Equally, if not more compelling, the NY State Bar Association has engaged in a multiyear study of a proposed revision to the Code of Professional Responsibility, essentially replacing the Code with the Model Rules, through its Committee on Standards of Attorney Conduct (COSAC) formed in 2003. COSAC’s report was unanimously approved by the New York State Bar Association’s House of Delegates on November 3, 2007.[32] The Proposed Rules are currently under submission to the Appellate Division, and COSAC’s report, and the new rules it would adopt, have already been cited with approval (see Alexander v Cahill, 2007 WL 2120024, 2007 US Dist LEXIS 53602 [ND NY 2007]).
Proposed rule 1.14 provides, in pertinent part,
“(b) Where the lawyer reasonably believes that the client has diminished capacity, is at risk of substantial physical, financial or other harm unless action is taken and cannot adequately act in the client’s own interest, the lawyer may take reasonably necessary protective action, including consulting with individuals or entities that have the ability to take action to protect the client and, in appropriate cases, seeking the appointment of a guardian ad litem or guardian[33]. . .
“(e) A lawyer should not be subject to professional *172 discipline for invoking or failing to invoke the permissive conduct authorized by this Rule if the lawyer has a reasonable basis for the lawyer’s action or inaction.”
The Comment recognizes that, in bringing a guardianship proceeding, “the lawyer is impliedly authorized to make the necessary disclosures, even when the client directs the lawyer to the contrary” (NY St Bar Assn, Proposed Rules of Professional Conduct rule 1.14, Comment 8 [“Disclosure of the Client’s Condition”]).
Based on all three relevant authorities, it appears that there is no ethical impediment to Kupferman’s bringing a limited guardianship proceeding for her client, and to disclosing to the article 81 court[34] whatever information may be necessary.[35] Such a proceeding is the “least restrictive alternative” available, and Kupferman is the only available person[36] with significant knowledge to bring it. In addition, the current Code provision relating to confidentiality[37] specifically provides that an attorney may not disclose communications with his client except under strictly *173 limited circumstances including “when permitted under Disciplinary Rules or required by law or court order” (Code of Professional Responsibility DR 4-101 [c] [2] [22 NYCRR 1200.19 (c) (2)] [emphasis added]).
As a court order definitively releases an attorney from liability under the Code, Kupferman’s motion to withdraw is granted contingent upon her commencing an article 81 proceeding for a limited property guardian for Diane Wells within 30 days. The trial previously scheduled for October 22 has been adjourned sine die pending the results of that hearing.

. They are for battery, assault, intentional infliction of emotional distress, contract reformation, severance and partition, conversion, unjust enrichment, constructive trust and breach of fiduciary duty. In the interpleader action brought by Transamerica Occidental Life Insurance Company, James as preliminary executor has asserted several cross claims against Diane, namely, duress, reformation of contract, unjust enrichment, constructive trust, breach of fiduciary duty/forfeiture, and fraud.

. Felder successfully moved to withdraw as counsel in June 2006, claiming that “communication [with Diane] has been basically impossible, and the attorney-client relationship has irreversibly reached a point of lack of communication.”

. In May 2007, Diane discharged that firm, and when no substitution was filed, Kramer & Dunleavy moved for, and was granted, leave to withdraw as counsel.

. A contested probate proceeding in which Diane challenges Joyce’s final will is currently pending in this court. In that action Diane has been continuously represented by Novick and Associates, specifically, Donald Novick of that firm.

. Between Burstein’s withdrawal and Katz’s retainer, in March and April 2008, Shargel and Elman again briefly served as counsel to Diane.

. In an affidavit in support of its subsequent motion to withdraw, the firm stated that “it was based upon those representations that we filed [the application for adjournment] so as to allow Ms. Wells the opportunity to regain her mental stability . . . .”

. At various times throughout the saga of withdrawal motions and discovery proceedings, counsel have urged the court to order a psychiatric examination of Diane. While a judge in a criminal proceeding possesses such authority (GPL 730.10 et seq.), there is no similar power on the civil side, where different constitutional requirements prevail.

. In fact, examination of his retainer agreement revealed that the possibility of his trying the case had been considered, and a different fee schedule included for that contingency.

. Katz admitted that he, alone among counsel in these actions, had been able to maintain a relationship with Diane, and that his concern was primarily with not having to act as trial counsel. Told that he was the “last lawyer standing,” Katz assured the court that he would continue to seek new trial counsel so as to permit his withdrawal.

. Counsel cited no authority, nor was the court cognizant of any which would permit the relief they requested under the circumstances of a duly executed substitution.

. (Cheney v Wells, NYLJ, Oct. 17, 2008, at 37, col 5 [Sur Ct, NY County]; Cheney v Wells, NYLJ, Oct. 21, 2008, at 35, col 2 [Sur Ct, NY County].) The latter specifically left a number of potential objections under CPLR 4519 to be decided at trial, where context would determine whether decedent’s prior testimony “opened the door” so as to avoid the prohibitions of the Dead Man’s Statute.

. Kupferman filed a revised witness list with 58 names, 20 of which lacked description.

. The second, the reply affidavit, responded to the opposition papers not unexpectedly filed by James’ counsel.

. In addition to Kupferman and James’ counsel in this action, Kornstein Veisz Wexler & Pollard, LLP, they included counsel in the pending probate action, Donald Novick for Diane, and Fulbright & Jaworski for James.

. When the October 22 trial date was set it appeared that discovery would be completed in the probate case by the end of September. October 7 was chosen for a conference in which a global settlement could be explored.

. Much of what led to this conclusion was divulged only in ways designed to maintain confidentiality, and so will not be repeated here.

. The problem presented to the court is thus different from, and greater than the ordinary difficulties which arise when a civil litigant lacks resources to obtain an attorney, or chooses to proceed pro se. It is precisely her lack of understanding of the potentially disastrous consequences of her failure to retain counsel that creates an ethical, as opposed to practical dilemma for the court.

. This reflects the legislature’s preference for “[(limited guardianships and the use of the least restrictive level of guardianship” (Bailly, Practice Commentaries, McKinney’s Cons Laws of NY, Book 34A, Mental Hygiene Law § 81.01, at 7 [2006]).

. The “dispositional alternatives” section of article 81 provides:
“If the person alleged to be incapacitated is found to be incapacitated and the court determines that the appointment of a guardian is necessary, the order of the court shall be designed to accomplish the least restrictive form of intervention by appointing a guardian with powers limited to those which the court has found necessary to assist the incapacitated person in providing for . . . property management” (Mental Hygiene Law § 81.16 [c] [2]).
The statute further provides that “[a]n incapacitated person for whom a guardian has been appointed retains all powers and rights except those powers and rights which the guardian is granted” (Mental Hygiene Law § 81.29 [a]).

. There has also been discussion about the appointment of a guardian ad litem (GAL) but, assuming anyone were willing to take on that role, it is unclear what the extent of the GAL’s powers would be in the event of predictable disagreement with Diane (see Matter of Bernice B., 176 Misc 2d 550, 553-559 [Sur Ct, NY County 1998] [GAL may not enter into settlement against ward’s wishes; article 81 proceeding required]; but see Matter of Feliciano v *168 Nielsen, 290 AD2d 834, 835 [3d Dept 2002] and New York Life Ins. Co. v V.K., 184 Misc 2d 727, 733 [Civ Ct, NY County 1999] [which cite, and apparently rely on dicta in Matter of Aho (39 NY2d 241, 246-247 [1976]), suggesting a GÁL should apply a “best interests” standard in acting for “the incompetent,” even where that action was contrary to the “incompetent” ward’s wishes. Aho was rendered prior to enactment of article 81, when, as well, the law still included the category “incompetent”]).
The legislature’s action in passing article 81, after a three-year study by the New York State Law Revision Commission and a process of extensive comments and hearings, strongly suggests that it is the sole remedy by which an adult’s financial or personal autonomy may be overridden (see Bailly, Practice Commentaries, McKinney’s Cons Laws of NY, Book 34A, Mental Hygiene Law § 81.01, at 7 [2006]).
The Commentaries to CPLR 1201, which provides for the appointment of GALs in civil actions, primarily for the purpose of ensuring valid judgments, both implicitly and explicitly notes the changes made by the passage of article 81 (Alexander, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C1201:2, at 305-307 [1997]).

. While the history of the case, and some in-court statements, known to James and his counsel make out the general outlines of the alleged need for a guardian, James and his counsel assert lack of specific knowledge necessary to meet the statutory standard and take the position that they are unable to commence a guardianship proceeding.

. A major problem confronting counsel bringing a protective proceeding is the necessary breach of the duty of confidentiality generally required by Code of Professional Responsibility DR 4-101 (22 NYCRR 1200.19).

. As explained in the Preliminary Statement to the Code: “The Ethical Considerations are aspirational in character and represent the objectives toward which every member of the profession should strive. They constitute a body of principles upon which the lawyer can rely for guidance in many specific situations” (Code of Professional Responsibility, Preliminary Statement, reprinted in NY CLS, Book 19B, Judiciary Law, Appendices, at 53; see Matter of Blum, 135 AD2d 253 [4th Dept 1988]).

. See EC 7-11 (“The responsibilities of a lawyer may vary according to the intelligence, experience, mental condition or age of [a] client ... or the nature of a particular proceeding. Examples include the representation of. . . an incompetent”) and EC 7-12 (“Any mental or physical condition that renders a client incapable of making a considered judgment on his or her own behalf casts additional responsibilities upon the lawyer. . . . But obviously a lawyer cannot perform any act or make any decisions which the law requires the client to perform or make, either acting alone if competent, or by a duly constituted representative if legally incompetent”).

. Of some significance, the conflicting opinions discussed there all preceded enactment of article 81; although one, Bar Association of Nassau County Committee on Professional Ethics Opinion 90-17 (1990), referred to the predecessor statute in ruling that an attorney could not contact a client’s family and suggested appointment of a conservator for an elderly client who appeared “eccentric” and engaged in peculiar financial transactions for no apparent reason.

. See e.g. S. Herr, Representation of Clients With Disabilities: Issues of Ethics and Control, 17 NYU Rev L & Soc Change 605, 618 (1989-1990), cited in Bar Report at 37.

. Both are cited in NY State Bar Association Committee on Professional Ethics Opinion 746 (July 18, 2001). The Bar Report relies heavily on model rule 1.14.

. The Comment allows the attorney to take protective actions including
“consulting with family members, using a reconsideration period to permit clarification or improvement of circumstances, using voluntary surrogate decisionmaking tools such as durable powers of attorney or consulting with support groups, professional services, adult-protective agencies or other individuals or entities that have the ability to protect the client” (ABA Model Rules of Professional Conduct rule 1.14, Comment 5 [ABA 2007]), while EC 7-12 leaves the determination of “competence” entirely to the attorney’s subjective judgment (Bar Report at 38).

. Subsection (1) reads,
“When a client’s capacity to make adequately considered decisions in connection with the representation is diminished, whether because of minority, physical illness, mental disability, or other cause, the lawyer must, as far as reasonably possible, maintain a normal client-lawyer relationship with the client and act in the best interests of the client as stated in Subsection (2).”

. Subsection (2) reads,
“A lawyer representing a client with diminished capacity as described in Subsection (1) and for whom no guardian or other representative is available to act, must, with respect to a matter within the scope of the representation, pursue the lawyer’s reasonable view of the client’s objectives or interests as the client would define them if able to make adequately considered decisions on the matter, even if the client expresses no wishes or gives contrary instructions.”

. See Restatement § 24, Comment e.

. The Report, which contains proposed rules with Comments and Reporter’s Notes, is available at: http://www.nysba.org/AM/ Template.cfm?Section=Professional_Standards_for_Attorneys&Template=/CM/ ContentDisplay.cfm&ContentID=15179.

. The Comment provides,
*172 “Seeking a guardian without the client’s consent (including doing so over the client’s objection) is appropriate only in the limited circumstances where a client’s diminished capacity is such that the lawyer reasonably believes that no other practical method of protecting the client’s interests is readily available. The lawyer should always consider less restrictive protective actions before seeking the appointment of a guardian. The lawyer should act as petitioner in such a proceeding only when no other person is available to do so” (NY St Bar Assn, Proposed Rules of Professional Conduct rule 1.14, Comment 7).

. The proceeding must be brought in Supreme Court, as Surrogate’s Court only has jurisdiction “in any proceeding in the surrogate’s court [where it appears that] a person interested in an estate ... is allegedly incapacitated with respect to property management under the provisions of this article” (Mental Hygiene Law § 81.04 [b]). Thus, while this court could properly entertain a petition in the probate proceeding, the instant action, originally commenced in Supreme Court, which technically does not relate to an interest in an estate, is insufficient to sustain jurisdiction here.

. All otherwise protected communications should, however, be submitted to the article 81 court with the request that they placed under seal (see NY St Bar Assn Comm on Prof Ethics Op 746 [July 18, 2001]).

. Prior lawyers possess some but not the most recent information. Equally significant, this court has no power to direct them to bring a proceeding, and none have volunteered.

. Proposed rule 1.6 (b) (6) is substantially similar to the current Code provision, but uses the phrase “to comply with other law or court order” rather than “required by law or court order.” The Reporters’ Notes state that “[t]he intended meaning is the same.” (NY St Bar Assn, Proposed Rules of Professional Conduct, at 38.)